UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

KENYATTA MITCHELL, as administrator of )
the Estate of Jeff Tyson.                )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )        No. 1:18-cv-00232-SEB-TAB
                                         )
CITY OF INDIANAPOLIS, et al.             )
                                         )
            Defendants.                  )

## ORDER ON PENDING MOTIONS

Now before the Court is Defendants' Motion for Summary Judgment [Dkt. No. 41].[1] Plaintiff Kenyatta Mitchell, as Administrator for the Estate of Jeff Tyson, brings this action against Defendants Henry Nunez, Ha'Le Rapier, Nicholas Wroblewski, Justin Keehn, all officers with the Indianapolis Metropolitan Police Department ("IMPD") (collectively, "the Officers"), and the City of Indianapolis ("the City"), pursuant to 42 U.S.C. § 1983, alleging that Defendants violated Mr. Tyson's rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiff also alleges state law wrongful death/battery, unreasonable seizure, and excessive force claims against Defendants. For the reasons detailed below, we GRANT Defendants' Motion.

---

[1] On July 9, 2019, Plaintiff filed a Motion for Leave to File Surreply to address new evidence raised in Defendants' reply in support of their summary judgment motion. Plaintiff's motion is hereby GRANTED, but the Court will consider only those portions of the surreply which address new evidence. Defendants filed their Motion to Exclude Expert Testimony [Dkt. 55] on May 31, 2019. Because the testimony does not affect our determination on summary judgment, that motion is DENIED AS MOOT.

**Factual Background**

**July 21, 2016 Report of Possible Theft from Vehicle**

On the early evening of July 21, 2016, at approximately 6:34 p.m., Defendant

Henry Nunez, an officer with the IMPD, while on duty on the northwest side of

Indianapolis, Indiana, was dispatched to the area of 8600 Michigan Road to respond to a

report of shots fired. When he and another IMPD officer arrived at the scene, they

checked the area but saw no one in distress, based on which they took no further action.

Approximately twenty minutes later, at 6:53 p.m., Officer Nunez was dispatched

to respond to a reported theft from a vehicle at 8640 Michigan Road—the same general

area where the officers had initially responded to the "shots fired" report. After arriving

at the scene, Officer Nunez spoke with the complainant, who, according to Officer

Nunez, was a man known to the IMPD who in past law enforcement investigations had

"always [been] helpful" to them. Nunez Dep. at 15. The complainant stated that he had

seen someone "possibly steal something from a vehicle" and that he had taken pictures

and a video of the incident. *Id.* at 14. The complainant said that he had observed a 1998

white Oldsmobile vehicle with license plate LE5369 pull into the Steak 'n Shake parking

lot approximately 50 to 100 feet away from where he was parked and stop beside a 2002

black Chevrolet Trailblazer. Dkt. 58-5 (July 21, 2017 Police Report) at 4. Two black

men exited the Oldsmobile, walked to the driver's side of the Trailblazer, and broke the

car window before fleeing. The first man was described as heavy set, approximately 6'2"

with braided hair, a hat, and possibly wearing a gray t-shirt. The second man was

approximately 180 pounds, had curly hair, and wore black clothing. The complainant stated that one of the suspects carried a black handgun. *Id.*

While at the scene, Officer Nunez viewed the video and pictures taken by the complainant and determined that "it appeared it was a handgun stolen from the vehicle." Nunez Dep. at 16. A license plate check of the suspect's vehicle came back as a white Oldsmobile registered to a Dominque Tyson. Dkt. 58-5. Thereafter, after additional IMPD officers arrived at the scene to handle the investigation, Officer Nunez was sent to patrol the area in search of the suspect vehicle. At the time Officer Nunez departed the scene, Officer Nunez believed, based on the complainant's report as well as his own review of the complainant's video and photographs, that the occupant(s) of the white Oldsmobile were in possession of a stolen firearm. Nunez Dep. at 16–17. Officer Nunez had left the scene prior to any contact with the victim of the break in. In addition, he did not review the police report at any point before July 25, 2016. *Id.* at 17–18.

Later that same evening, at approximately 8:32 p.m., following Officer Nunez's departure from the scene, two other IMPD officers contacted the owner of the Trailblazer, Darryan Whorton, to inform him of the incident and to inquire as to why the vehicle had been left in the parking lot. Dkt. 58-5 at 5. Mr. Whorton reported that he had been the victim of a robbery a few hours earlier when two black males in a red Camaro approached him as he was parked in the Steak 'n Shake parking lot, located at 8640 N. Michigan Road. *Id.* According to Mr. Whorton, the two men exited their vehicle, brandished a firearm, and demanded all his money. Mr. Whorton gave them $50.00 and then fled on foot from the suspects, abandoning his vehicle in the parking lot. *Id.* The

suspects shot the rear tire on the driver's side of Mr. Whorton's vehicle and chased him until he entered a Denny's restaurant. *Id.* Mr. Whorton described his assailants, saying that the first suspect wore dreadlocks, was approximately 6'2" and 225 to 250 pounds, and was dressed in black, and the second suspect was tall and skinny and was wearing a red shirt and red pants. *Id.* There is nothing in the police report indicating whether Mr. Whorton had reported that he kept a firearm in his Trailblazer, or that a firearm had been stolen from his vehicle. There was also no firearm listed in the "Incident Property" section of the police report to indicate that a firearm was stolen.

There is no evidence that IMPD officers contacted Dominque Tyson, the registered owner of the white Oldsmobile vehicle, as part of the investigation into the reported theft and/or robbery. Mrs. Tyson testified that she recalls that, at the time of the alleged theft and robbery, she and her husband, Jeff Tyson, were both at home and the white Oldsmobile was parked outside the apartment they shared. Tyson Aff. ¶ 5. Mr. Tyson was a black male, approximately 6'4" tall, and wore his hair in dreadlocks during July 2016. According to Mrs. Tyson, her husband has a medium build, was not heavy-set, had not worn braided hair since 2011, did not wear hats because they did not fit well over his dreadlocks, and always wore tank tops— not t-shirts—in July.[2] *Id.*

**Officer Nunez Identifies the White Oldsmobile on July 25, 2016**

---

[2] Whether Mr. Tyson ever wore t-shirts in July is vigorously disputed between the parties. Plaintiff argues that Mrs. Tyson, because she was Mr. Tyson's wife, would know best regarding this detail. In response, Defendants have submitted court records from Mr. Tyson's July 24, 2004 conviction for armed robbery revealing that he was wearing a t-shirt when he committed the crime. So, maybe he did, or maybe he didn't. We make no attempt to resolve this issue because we have no need to, despite the impassioned arguments of counsel.

A few days later, during the early evening of July 25, 2016, Jeff and Dominque Tyson decided to drive to the Popeye's Chicken located near the intersection of Michigan Road and 86th Street to pick up dinner before they had planned to celebrate Mrs. Tyson's thirtieth birthday the next day. Tyson Dep. at 38–39, 41. Mr. Tyson drove the white Oldsmobile bearing license plate LE5369 that was registered to Mrs. Tyson – the same vehicle that was reportedly involved in the July 21 incident. Mrs. Tyson was the front seat passenger. *Id.* at 39–40. As they drove away from the restaurant to return to their apartment with the food they had purchased at Popeye's Chicken, the Tysons noticed a police car in their rearview mirror. *Id.* at 42.

Officer Nunez had been assigned that night to patrol the northwest side of Indianapolis along with Defendant IMPD Officer Ha'Le Rapier. In the early evening, the officers were in their patrol car travelling northbound on Michigan Road, near the intersection of Michigan and 86th Street. As they approached the intersection, Officer Nunez observed a white Oldsmobile traveling southbound on Michigan Road. *Id.* at 12. Officer Nunez testified that he was able to see the driver and wanted to get a clear view of the vehicle's license plate to determine whether it matched the license plate of the vehicle reportedly involved in the firearm theft the previous week, so he maneuvered the patrol car to proceed southbound in order to follow behind the Oldsmobile. *Id.* at 13. After following the Oldsmobile for approximately one mile, Officer Nunez was able to read the license plate and determine it was a match to the suspect vehicle. *Id.* at 22.

Officer Nunez explained this finding to Officer Rapier, who attempted to call another IMPD officer who also had responded to the July 21 theft call for any updates on

the investigation of the incident, but she was unable to reach that officer. *Id.* Officer Nunez then radioed a report that he was following a vehicle which he believed had recently been involved in a firearm theft and was requesting backup assistance. *Id.* at 11, 22–23. At the time Officer Nunez identified the vehicle, no warrants had been issued for either Jeff or Dominque Tyson or for the white Oldsmobile with license plate LE5369.

Defendants Nicholas Wroblewski and Justin Keehn, both IMPD officers, responded that they were available to assist and provided their locations. The white Oldsmobile was by then driving toward where Officers Wroblewski and Keehn were located, so Officer Nunez decided to wait to stop the car until he and Officer Rapier were closer to their backup. When the suspect vehicle turned onto 71st Street, Officer Keehn turned behind Officer Nunez and began following both Nunez and the Oldsmobile. *Id.* at 23–24.

**Defendants' Account of Gas Station Traffic Stop**

Shortly thereafter, the Oldsmobile turned left into a Marathon gas station located at the southeast corner of 71st Street and Georgetown Road and parked at one of the gas pumps. *Id.* at 24–25. Officer Nunez activated the emergency lights on his vehicle to effect a traffic stop on the Oldsmobile. *Id.* at 24. Officer Nunez testified that the basis for the traffic stop was both to investigate whether the driver was the suspect from the theft of the handgun and also because the driver had committed a traffic infraction by signaling as he turned into the gas station rather than signaling at least 200 feet in advance of the turn. *Id.* at 28. Officer Keehn also activated the lights on his police car to assist in the traffic stop.

6

There is some dispute regarding some of the following events:  According to Defendants, Officers Nunez and Rapier, having stopped the white Oldsmobile, got out of their patrol car and approached the passenger side of the suspect vehicle.  *Id.* at 34.  The windows of the Oldsmobile had a dark tint, making it difficult to see inside the car.  When Officer Rapier arrived, she stood beside the front passenger window and ordered the driver, Mr. Tyson, to roll down the window and produce his license and registration.  Mr. Tyson refused to comply.  Rapier Dep. at 17; 32.  Officer Rapier recalls that Officer Nunez then informed Mr. Tyson that he had been stopped for failing to properly signal before turning.  *Id.* at 32.

Officer Keehn next approached the driver's side of the suspect vehicle.  Keehn Dep. at 29.  Officer Nunez recalls instructing Officer Keehn to keep his distance as he approached, emphasizing that there could be a weapon inside the vehicle.  Nunez Dep. at 35.  Officer Keehn instructed Mr. Tyson to lower his window so that they could talk and tried to communicate that the stop was "not that big of a deal."  Keehn Dep. at 30.  Officer Rapier also attempted to calm the Tysons, reassuring them that nothing was going to happen if they exited the vehicle and complied with the officers' commands.  Rapier Dep. at 28.  When Officer Keehn reached the driver side door, he testified that Mr. Tyson "rolled his window down like maybe half an inch and told [Keehn], FU."  Keehn Dep. at 30.  Officer Keehn told Mr. Tyson "sir [,] get out of the car … in a nice way."  Dkt. 58-11 at 4.  Neither of the Tysons exited the car despite the officers' instructions to do so.

Officer Wroblewski then radioed their supervisor, Sgt. Daniel Kistner, reporting that the Tysons had barricaded themselves inside the vehicle, meaning that the vehicle

doors were locked with its windows closed and the occupants were refusing to exit the vehicle or comply with commands. Wroblewski Dep. at 27–30; Nunez Dep. at 42. The IMPD's standard "go-to procedure" in such situations "is to call for a supervisor and follow their instructions." Nunez Dep. at 39. Sgt. Kistner advised that he was "clear" (meaning he understood the radioed report) and was "en route." *Id.* at 40.

According to Officer Nunez, Mr. Tyson became increasingly angry during this period and began yelling loudly that the officers were "motherfuckers" and "racist cops that were going to kill him." Nunez Dep. at 35–36. Mr. Tyson repeatedly ordered the officers to "get away" from his car and screamed to onlookers present at the gas station, "Hey, they're trying to kill me." *Id.* at 36. Officer Rapier attempted to de-escalate the situation by referencing the fact that she, like Mr. Tyson, was black, but the statement reportedly seemed to have the opposite effect, and things became "suddenly a lot more erratic, a lot more yelling, a lot more forceful." *Id.* at 36, 40. As Mr. Tyson continued yelling, Officer Keehn "just wanted him to get out of the car so [they] could talk to him about the investigation about … the theft of the gun." Keehn Dep. at 31.

The situation intensified, and Officer Nunez recalls becoming concerned that Mr. Tyson might exit the vehicle and attempt to fight the officers, so he changed positions to join Officer Keehn at the driver's side of the vehicle. *Id.* at 36. Mr. Tyson's had placed his hands up against the ceiling of the vehicle, but Officer Nunez observed him drop his hands to the steering well and begin looking between his legs and behaving in a manner "consistent with having something there." *Id.* at 43. Officer Nunez testified that he continued to be concerned that Mr. Tyson was going to retrieve a weapon because he had

reason to think there was one located inside the vehicle.  When Mr. Tyson's hands

dropped to his lap, they were so low that Officer Nunez worried that he would be unable

to safely or adequately respond if Mr. Tyson did reach for a weapon.  According to

Officer Nunez, "that necessitated the escalation" of the situation by the police.  *Id.*

Officer Nunez briefly consulted with Officer Wroblewski to formulate a plan to

regain control of the confrontation, given that Mr. Tyson was failing to comply with the

officers' orders.  *Id.* at 37.  Like Officer Nunez, Officer Wroblewski was also concerned

about the escalation of Mr. Tyson's behavior and believed if they waited too long to act,

Mr. Tyson would have an opportunity to use force against them.  Wroblewski Dep. at 56.

Officer Wroblewski determined that because Mr. Tyson was "actively causing such a

ruckus and being very unpredictable and unstable," the officers could not wait to act for

Sgt. Kistner's arrival or for SWAT officers to respond to the scene.  *Id.*

Officer Wroblewski approached the driver's side of the vehicle and informed Mr.

Tyson that if he did not lower his window, it was going to be broken.  Wroblewski Aff.

¶ 16.  Officer Wroblewski believed the window needed to be lowered because, with the

dark tint on the windows, they were having difficulty observing what was occurring

inside the vehicle.  *Id.*  When Mr. Tyson again did not lower his window and continued

yelling at the officers, Officer Wroblewski used a window punch to break the front

driver's side window of the vehicle.  Wroblewski Dep. at 35; Keehn Dep. at 33.  The

window did not shatter initially because the tint film was holding it together in one piece,

so Officer Keehn used his flashlight to break out the remainder of the window.  Keehn

Dep. at 33–34.  Mr. Tyson was screaming hysterically, shouting, "Oh my God!"  Dkt. 58-

11 at 5.  According to Officer Wroblewski's initial statement, Mr. Tyson's hands were raised upward at this point.  Dkt. 58-12 at 3.

Once the window was broken, Officer Keehn observed Mr. Tyson reach under the seat.  Concerned that Mr. Tyson was reaching for a firearm, Officer Keehn bladed his body away from Mr. Tyson and attempted to unlock the door with his left hand so that he could open it and remove Mr. Tyson from the vehicle.  He was unable to accomplish this extraction, however, because Mr. Tyson kept trying to grab Officer Keehn's hand and pull him inside the car.  At this point, Officer Keehn was holding his weapon down by his legs to keep it away from Mr. Tyson.  When Mr. Tyson saw Officer Keehn's firearm, "he was like FU.  Put your F'ing gun away.  F the police.  I'm not getting out of the car." *Id.* at 34.  A cellphone video taken by a bystander at the gas station captured Mr. Tyson yelling, "Bitch!  Put your gun up!"  Dkt. 42-11 at 00:26–00:28.

Following Mr. Tyson's attempt to pull Officer Keehn's hand inside the vehicle, Officer Wroblewski announced to the other officers that he was going to use the pepper ball gun[3] in an attempt to force Mr. Tyson out of the vehicle.  Officer Wroblewski testified that the pepper ball gun was the "best choice" to contain the situation because he did not believe he was able to reach inside the vehicle to apprehend Mr. Tyson, nor did he believe he could effectively use a taser or OC (pepper) spray to apprehend him because not enough of Mr. Tyson's body was exposed for the taser to achieve neuromuscular incapacitation and the OC spray could have incapacitated not only Mr.

---

[3] The pepper ball gun shoots projectiles that, on impact, emit a powder that has an effect similar to pepper spray.

Tyson, but also would hit any of the officers near him at the time. Wroblewski Dep. at 49–51; Wroblewski Aff. ¶¶ 25–27. Officer Wroblewski believed the pepper ball gun was a superior option under the circumstances because it had effects similar to OC spray, but allowed him to stand at a distance when he deployed the weapon, while at the same time permitting his zone partner to maintain lethal cover. Wroblewski Aff. ¶¶ 28–29.

Officer Keehn recalls that, while Officer Wroblewski retrieved the pepper ball gun from the trunk of his police car, Officer Keehn again ordered Mr. Tyson to exit the vehicle and warned him that he would be shot with a pepper ball gun if he refused to comply. Keehn Dep. at 50, 52. Mr. Tyson remained in the vehicle and Officer Nunez then instructed Officer Keehn to "holster up [his weapon], back up." Dkt. 58-11 at 5. Officer Rapier also backed away from the car at this point. Rapier Dep. at 21.

As Officer Wroblewski approached the vehicle with the pepper ball gun, Mr. Tyson stated, "I did not do shit." Wroblewski Aff. ¶ 33. Officer Wroblewski then ordered Mr. Tyson to "get out of the car right now," and Mr. Tyson responded "Nope. No. No." *Id.* ¶¶ 34–35. Officers Nunez, Rapier, and Keehn all retreated from the vehicle and Officer Wroblewski fired three pepper balls at Mr. Tyson, which he believes struck Mr. Tyson in the chest. *Id.* ¶¶ 36–37; Nunez Dep. at 46; Keehn Dep. at 37–39; Rapier Dep. at 21. At the time he deployed the pepper ball gun, Officer Wroblewski believed Mr. Tyson was the only occupant of the vehicle. Wroblewski Aff. ¶ 38. He then ordered Mr. Tyson to "get out of the car" and to "get out of the car, now." *Id.* ¶ 39.

Mr. Tyson again did not comply with the officer's order and instead put the vehicle in drive and accelerated away quickly from the gas pump, speeding through the

gas station parking lot, and onto the road.  *Id.* ¶¶ 39, 42.  At some point after the pepper

balls were deployed and before the Mr. Tyson drove away from the gas station, Mrs.

Tyson jumped, or fell out, of the vehicle.  Keehn Dep. at 77; Breedlove Aff. ¶ 20.   As

Mr. Tyson drove away, Officer Wroblewski fired approximately six additional pepper

ball rounds at him.  Wroblewski Aff. ¶ 45.  Video footage taken from the Marathon gas

station shows that the entire incident extended over approximately four and a half

minutes.  Dkt. 42-10 at 00:25–04:45.

**Mrs. Tyson's Account of Gas Station Traffic Stop**

Mrs. Tyson recalls that it was not until after she and Mr. Tyson were parked next

to the gas pump at the Marathon gas station that the officers first activated their lights and

initiated a traffic stop.  Tyson Dep. at 43–44.  A black female officer (Officer Rapier)

came to Mrs. Tyson's side of the car and instructed her to lower her window.  *Id.* at 71–

72.  Multiple police officers then approached on both sides of the vehicle and

immediately ordered the Tysons to "[g]et out of the car."  *Id.* at 45.  Mr. Tyson asked,

"[g]et out of the car for what?"  *Id.*  A male police officer responded, "Get out of the car.

Get out of the mother fucking car."  *Id.*  Mr. Tyson responded, "No, I'm scared.  No, I'm

scared."  Dkt. 43-12 at 00:19:28–00:19:38.

Mrs. Tyson did not understand what was happening and was "in shock that there

were so many police officers surrounding the car."  Tyson Dep. at 46.  She testified that

she was scared because this was, at least in her experience, unlike a normal traffic stop

where an officer would ask for identification in a respectful manner.  She had been

stopped when riding with Mr. Tyson on previous occasions but never during those traffic

stops had she been surrounded by multiple officers with guns yelling for her to get out of the car. *Id.* at 48, 50.

Neither of the Tysons exited the vehicle. Mr. Tyson asked the officers, "What did we do? For what, for what?" *Id.* at 47. Officer Rapier responded, "You failed to signal." *Id.* Mr. Tyson said, "What? No, we didn't." *Id.* Consistent with what Mr. Tyson told the police officers, Mrs. Tyson also remembers that Mr. Tyson used his turn signal before pulling into the gas station. *Id.* According to Mrs. Tyson, tensions were already high at this point in the encounter because the police officers "had guns and they were pointing at us." *Id.* at 72. None of the police officers ever mentioned the firearm theft as a reason for the traffic stop. Exh. 43-12 at 00:18:06–00:18:15.

Mr. Tyson then pulled out his cellphone, called his mother, and told her that he was being pulled over for the fourth time that week.[4] He said, "I'm scared! Mama, come and get me. I don't know what's going on!" Tyson Dep. at 74. In her recorded statement following the traffic stop, Mrs. Tyson stated that the officers could see that Mr. Tyson had a cellphone and was using it to make a call. Dkt. 43-12 at 00:16:39–00:16:46. She said that Mr. Tyson had only a cellphone with him in the car and that she never saw a firearm in the vehicle "at all," but conceded that Mr. Tyson would not have told her if he had a gun *Id.* at 00:16:50–00:16:57.

---

[4] According to Mrs. Tyson, one of those four stops occurred on July 24, 2016, when the police stopped Mr. Tyson, questioned him, and searched the white Oldsmobile for approximately an hour looking for weapons. He was then released without receiving a ticket. Tyson Aff. ¶ 14. There is no indication that any of the individual defendants were involved or were otherwise aware of such a search.

The officers continued yelling, "Get the fuck out. Get the fuck out of the car." *Id.* at 50. Mrs. Tyson put her hands up and started screaming, "Oh, my God. What is going on?" Tyson Dep. at 51. At some point, the officers said they were going to break the window of the vehicle and pull Mrs. Tyson out of the car. *Id.* at 48–49. Mrs. Tyson repeatedly asked, "For what? What did we do?" *Id.* at 51. Mrs. Tyson continued screaming and testified that she was scared for her life. *Id.* at 53.

Mrs. Tyson next saw Officer Wroblewski come from the rear of the vehicle with "a real big gun" and as he approached the car, he said, "I'm gonna shoot you right now if you don't get out of the car right now." *Id.* at 50–51; Dkt. 43-12 at 00:20:38–00:20:43. All the officers surrounded the car with their guns and Mrs. Tyson believed they were going to shoot and kill her and Mr. Tyson while they sat in the vehicle. Tyson Dep. at 51. Mr. Tyson then leaned toward Mrs. Tyson and she saw that Officer Wroblewski was pointing the "big 'ole gun" at the front driver's side window. Dkt. 43-12 at 00:19:49–00:20:09. Mrs. Tyson heard a crash, which she thought was the window breaking, and, at that point, grabbed the door handle and fell out of the car as Mr. Tyson drove away. *Id.* at 00:20:45–00:20:52. She does not recall getting hit with a pepper ball before she fell out of the car. Tyson Dep. at 61.

**Officer Nunez Is Shot While Pursuing Mr. Tyson**

After Mr. Tyson sped through the Marathon parking lot, he turned south on Georgetown Road. Rapier Dep. at 21. Officers Nunez and Rapier ran to their patrol car and began pursuing Mr. Tyson. Rapier Dep. at 22. Officer Wroblewski used his radio to

report that officers were involved in a vehicle pursuit and had headed south on Georgetown Road. Kistner Aff. ¶ 22.

With Officers Nunez and Rapier in pursuit, Mr. Tyson made a U-turn near the 6500 block of Georgetown Road by Lake Camelot Apartments and began traveling northbound on Georgetown. Nunez Dep. at 49. Officer Rapier had not seen Mr. Tyson with a firearm in his possession at any point during the traffic stop, but, as he completed the U-turn, she saw him raise the barrel of a gun and begin firing rounds at her and Officer Nunez. Rapier Dep. at 18, 22. Officer Rapier remembers hearing at least three gunshots and seeing glass flying their way. *Id.* at 22. Officer Nunez recalls there being "a lot of bullets very quickly" and then he was "blinded in [his] left eye for a moment and felt blood down the back of [his] neck." Napier Dep. at 51. He believed he had been hit in the head and was dying. *Id.* He looked down and saw that he was also bleeding from his leg. *Id.* at 53. Officer Napier told Officer Rapier that he had been shot and got on the radio to report, "Control, I've been shot." Rapier Dep. at 24. Fearing that Mr. Tyson could return and continue shooting at them, Officer Nunez then drove the patrol car down an embankment into a parking lot in a residential area. Nunez Dep. at 51. They did not encounter Mr. Tyson again. Rapier Dep. at 25.

After Officer Nunez parked the patrol car, Officer Rapier assisted him in assessing his injuries and applying first aid. Once it was determined that his injuries were not life-threatening, Officer Nunez reported on the radio that he was not seriously injured and would wait for the ambulance to arrive. Officer Nunez was taken by ambulance to Methodist Hospital and Officer Rapier rode with him. He was ultimately determined to

have suffered a gunshot wound in the right ankle, a graze wound to the back of the head, and injuries to the eye, arms, and face from glass shards.  Napier Dep. at 53–54.

**The Continuing Police Pursuit and Use of Deadly Force[5]**

Shortly after firing shots at Officer Nunez, Mr. Tyson made another U-turn so that he was once again proceeding southbound on Georgetown Road.  Several additional officers joined the pursuit of his vehicle as Mr. Tyson turned west onto 56th Street and then proceeded onto I-465 South, driving at speeds of up to 110 to 120 miles per hour.  During this time period, two of the officers pursuing Mr. Tyson made separate reports that he had fired shots at them, with one vehicle having been hit and out of the chase.  As Mr. Tyson entered I-465, officers pursuing him radioed for a SWAT team and for stop sticks to be placed at various locations on the interstate to disable his vehicle.  At this point, Mr. Tyson was traveling at speeds of approximately 120 to 130 miles per hour.

Mr. Tyson avoided one set of stop sticks, but hit a second set, causing the driver's side front tire to begin deflating.  Mr. Tyson then slowed to approximately 60 miles per hour, exited I-465, and began driving south on U.S. 31.  After briefly returning to I-465 and once again exiting back onto U.S. 31, Mr. Tyson eventually reached downtown Indianapolis driving approximately 70 miles per hour with multiple IMPD and SWAT officers in pursuit.  When the vehicle pursuit neared Washington Street and Rural Street, Mr. Tyson slowed considerably, drove through a parking lot and entered an alley.  After

---

[5] None of the named Defendants were personally involved in either the ensuing car chase or the shooting death of Mr. Tyson.  Accordingly, we have summarized these facts only to the extent relevant to the issues presented in this case.

exiting the alley, Mr. Tyson drove south on Rural Street, east on Meredith Avenue, north on Oxford Street, and west on Newton Street.  The chase ended when Mr. Tyson's car hit a telephone pole on the south side of Newton Street.

According to the police report, Mr. Tyson then began shooting at the officers through the passenger window of his vehicle.  In all, sixteen officers used deadly force against Mr. Tyson, returning fire in two separate volleys.  Mr. Tyson ultimately died at the scene from his gunshot wounds.

**July 26, 2016 Interview with Darryan Whorton**

On July 26, 2015, the day after Mr. Tyson was killed, Mr. Whorton called the IMPD and asked to speak with an officer regarding the July 21, 2016 robbery that he had previously reported.  He was transferred to Detective Steve Scheid who took his recorded statement.  During the July 26 interview, Mr. Whorton stated that, on July 21, 2016, he was stopped at the traffic light at 86th Street and Michigan Road in the lane second from left when a man exited the driver's side of a tan-colored car in the left-hand turn lane. The man carried a black gun and said, "gimme everything you got before I blast you." Dkt. 60-2 at 00:05:05–00:05:08.  After Mr. Whorton gave the man the money he had, the man shot the tire of Mr. Wharton's Traiblazer.  Mr. Whorton drove into the Steak 'n Shake parking lot, parked his car, and traveled on foot to the White Castle parking lot with the two men in pursuit.  The men only stopped following Mr. Whorton when he ran to a Denny's restaurant further down the road.

Mr. Whorton told Detective Scheid that he knew the man who robbed him as well as the passenger in that car.  He said he believed the man with the gun was named Jeff

Tyson and that he knew the other man was Tyler Mitchell. *Id.* at 00:05:08–00:05:33.

Mr. Wharton stated that he knew Mr. Mitchell from high school and that Mr. Mitchell

had previously introduced him to Mr. Tyson, who was Mr. Mitchell's brother. *Id.* at

00:05:40–00:05:49. Mr. Wharton said that he had previously had a "beef" with Mr.

Mitchell over "girls" but that their issues had never involved the police. Detective Scheid

showed Mr. Whorton a photo array and Mr. Wharton identified Mr. Tyson as the

individual who robbed him on July 21, 2016. Scheid Aff. ¶ 11; Dkt. 60-3.

According to Mr. Whorton, he gave the men $450.00 while stopped at the

intersection but had nothing else taken from his person or vehicle. Although a witness

reported that a firearm had later been stolen from Mr. Whorton's Trailblazer as it sat in

the Steak 'n Shake parking lot, Mr. Whorton denied this in his taped statement to police,

stating that he had not been in possession of a firearm on July 21, 2016 and had not had a

firearm stolen from his vehicle that day. Dkt. 60-3 at 00:07:47–00:08:06. Mr. Whorton

stated that he had no knowledge that Mr. Tyson was involved in a police action shooting

the previous evening or that he had been killed. *Id.* at 00:10:40–00:11:44.

Following this interview, Detective Scheid updated the July 21, 2016 police report

regarding the reported theft from a vehicle to add Jeff Tyson as a suspect in the reported

robbery and to clear out the charges because Mr. Tyson was dead and the robbery

incident did not require further investigation. Scheid Aff. ¶ 15; Dkt. 58-7.

**The Instant Litigation**

On January 24, 2018, Plaintiff filed a Complaint for Damages in Marion Superior

Court alleging, *inter alia*, that unidentified officers employed by the City of Indianapolis

used excessive force when attempting to seize Mr. Tyson on July 25, 2016, in violation of Mr. Tyson's constitutional rights. Defendants timely removed the case to this court on January 26, 2018.

Plaintiff amended her complaint on August 14, 2018 to specifically identify the Defendant officers and add claims against them under § 1983 for false arrest, unreasonable seizure, and excessive force (Counts I and II) as well as state law claims of unreasonable seizure, excessive force, and wrongful death/battery (Count III) against the City. On August 6, 2019, the Court granted Plaintiff's Motion for Leave to File Second Amended Complaint in order to correct the spelling of Defendant Wroblewski's name.

Now pending before the Court is Defendants' Motion for Summary Judgment [Dkt. 41].

## Legal Analysis

### I. Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

**II.    Discussion**

**A.    Federal Claims**

In this lawsuit, Plaintiff claims that Officers Nunez, Rapier, Keehn, and Wroblewski seized Mr. Tyson without a warrant and without reasonable suspicion that he had committed a crime, arrested him without probable cause, and used unreasonable force against him, all in violation of his Fourth Amendment rights.  In their motion for summary judgment, the Officers contend that they are entitled to qualified immunity with respect to each of these claims.

**1.    Qualified Immunity Standard**

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Thus, qualified immunity "shields from liability police officers 'who act in ways they reasonably believe to be lawful.'"  *Jewett v. Anders*, 521 F.3d 818, 822 (7th Cir. 2008) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). The inquiry has two parts: (1) whether a defendant violated a constitutional right and (2) whether the right was clearly established at the time of the violation.  *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (citing *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012)). These questions may be addressed in either order.  *Id.*  (citing *McComas*, 673 F.3d at 725).

"If a defendant asserts that [he or] she is entitled to qualified immunity, the plaintiff bears the burden of defeating the immunity claim." *Archer v. Chisholm*, 191 F. Supp. 3d 932, 942 (E.D. Wis. 2016) (citing *Betker*, 692 F.3d at 860).  A plaintiff can

show that a law is clearly established and defeat qualified immunity "either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he [or she] was acting lawfully." *Abbott v. Sangamon Cty.*, 705 F.3d 706, 723–24 (7th Cir. 2013).

We address Plaintiff's claims in turn below.

## 2.    Unlawful Seizure and False Arrest

The Fourth Amendment protects "[t]he right of the people to be secure in their persons … and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV.  The touchstone of the Fourth Amendment is reasonableness under all the circumstances, *Brigham v. City v. Stuart*, 547 U.S. 398, 403 (2006), a standard which "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States v. Hensley*, 469 U.S. 221, 228 (1985) (citations omitted).

For the purposes of analyzing Fourth Amendment seizures, there are three types of police-citizen interactions.  *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990) (citing *United States v. Black*, 675 F.2d 129, 133 (7th Cir. 1982)).  Within this framework, progressively deeper intrusions into privacy require progressively weightier justifications.  *See id.*  Consensual encounters, over which police exercise no control and which are therefore not Fourth Amendment seizures at all, require no particularized suspicion.  *Id.*  Investigatory stops, or *Terry* stops, which are limited to brief, nonintrusive detentions, require reasonable suspicion of criminality supported by specific, articulable

facts. *Id.* Full arrests, subjecting the arrestee to a litany of intrusions, *see Utah v. Streiff*, 136 S. Ct. 2056, 2070 (2016) (Sotomayor, J., dissenting), require probable cause to believe the person is committing or has committed a crime. *Johnson*, 910 F.2d at 1508.

The proper preliminary characterization of each police-citizen encounter is thus critical because it defines the quantum of suspicion necessary to justify police conduct at a particular moment. *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995). Nonseizures may ripen into seizures, *see Abbott v. Sangamon County*, 705 F.3d 706, 719–20 (7th Cir. 2013), and *Terry* stops may ripen into arrests, *see Matz v. Klotka*, 769 F.3d 517, 524–25 (7th Cir. 2014), so long as the seizure is supported by a sufficient quantum of suspicion. Because such sufficiency is tested by viewing "the facts and circumstances within [a police officer's] knowledge" "at the moment the decision [to seize] was made," disregarding later acquired information, *Qian v. Kautz*, 168 F.3d 949, 953–54 (7th Cir. 1999), it is also critical to determine when in the timeline of events a particular characterization attaches.

A defendant is entitled to qualified immunity in this context if a reasonable officer could have believed that "arguable" reasonable suspicion (for a *Terry* stop) or probable cause (for an arrest) existed to detain the plaintiff. *See Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014); ("Due to qualified immunity's protection, an officer needs only 'arguable' probable cause."); *Minett v. Overwachter*, ___ F. Supp. 3d ___, 2020 WL 224342, at *5 (W.D. Wis. Jan. 15, 2020) ("[D]efendant is entitled to qualified immunity if a reasonable officer could have believed that 'arguable' reasonable suspicion or probable cause existed to detain plaintiff."); *Rouei v. Vill. of Skokie*, 61 F. Supp. 3d 765,

778 (N.D. Ill. 2014) ("[Q]ualified immunity exists in a false arrest case where there is 'arguable' probable cause, … and thus it likely exists in a false *Terry* stop case where there is 'arguable' reasonable suspicion.").  Arguable reasonable suspicion and probable cause are established "when a reasonable officer 'in the same circumstances and … possessing the same knowledge as the officer in question could have reasonably believed that [reasonable suspicion or] probable cause existed in light of well-established law.'" *Huff*, 744 F.3d at 1007 (quoting *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998)).

Our task in addressing Plaintiff's Fourth Amendment unlawful seizure and false arrest claims here is made more difficult given that the parties have failed to clearly apply the above outlined framework to the facts at issue "and consequently (have) not (been) scrupulous in identifying precisely … to what degree [Mr. Tyson] was seized." *Ballheimer v. Batts*, No. 1:17-cv-01393-SEB-DLP, 2019 WL 1243061, at \*6 (S.D. Ind. Mar. 18, 2019).  As a result, it has been difficult for us to pinpoint "who says that [Mr. Tyson] was subject to what seizure at what time supported (or not) by what quantum of suspicion." *Id.* at \*7.  Our analysis is hampered by Defendants' confusing references to the probable cause and reasonable suspicion standards and Plaintiff's reliance only on probable cause without citing to even a single case in the argument section of her brief. The Officers appear to argue that they are entitled to qualified immunity on Plaintiff's unlawful seizure and false arrest claims because there was arguable probable cause to arrest Mr. Tyson at the time they stopped the vehicle or at least reasonable suspicion for the initial stop of the vehicle, and once Mr. Tyson refused to exit the vehicle, they had probable cause to arrest him for numerous offenses, including resisting law enforcement.

We thus shall begin our analysis with a discussion of the lawfulness of the initial stop of the Tysons' vehicle. An automobile stop "is subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. *Whren v. United States*, 517 U.S. 806, 810 (1996). Defendants bear the burden of demonstrating the legal and factual justification for a warrantless stop by a preponderance of the evidence. *United States v. Watson*, 900 F.3d 892, 895 (7th Cir. 2018). A warrantless traffic stop is justified if police have probable cause to believe that the driver has committed "even a minor traffic offense." *United States v. Garcia-Garcia*, 633 F.3d 608, 612 (7th Cir. 2011). The Fourth Amendment also permits law enforcement to conduct brief investigatory stops of vehicles based on a reasonable suspicion of criminal activity. *Navarette v. California*, 572 U.S. 393, 396–97 (2014) (citing *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *Terry v. Ohio*, 392 U.S. 1, 21–22, 30 (1968)). "Reasonable suspicion amounts to something less than probable cause but more than a hunch." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005). The reasonableness of a stop depends on "both the content of the information possessed by police and its degree of reliability." *Navarette*, 572 U.S. at 397 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

Officers Nunez, Rapier, Keehn, and Wroblewski argue that they had probable cause to stop the white Oldsmobile because Mr. Tyson had committed a traffic violation by failing to properly signal before turning into the Marathon gas station. If unrebutted, evidence of such a traffic violation would justify the warrantless stop of the vehicle. *See United States v. Smith*, 80 F.3d 215, 219 (7th Cir. 1996) (officer had probable cause to stop vehicle that had been straddling lines and failed to signal before turning). Here,

however, Mrs. Tyson was adamant in her deposition that she "know[s]" Mr. Tyson used his turn signal. Tyson Dep. at 47. The only evidence in the record on this point is the parties' dueling deposition testimony, the resolution of which is outside the court's purview on summary judgment because it necessarily would require a determination as to the credibility of the witnesses or otherwise entail the weighing the conflicting testimony. Because the only evidence presented on this issue is the Officers' word against Mrs. Tyson's, there exists a genuine issue of material fact as to whether the Officers did in fact observe a traffic violation before stopping the white Oldsmobile.

We find that the initial stop of the vehicle was, however, supported by reasonable suspicion and thus lawful. At the time of the stop of the Tysons' vehicle on July 25, 2016, Officer Nunez had knowledge that, a few days earlier, on July 21, 2016, a theft from a vehicle had been reported at 8640 Michigan Road. Based on the details gleaned from the complainant as well as his personal review of the complainant's cellphone video of the incident, Officer Nunez learned that two black men, one carrying a firearm, exited a white Oldsmobile with license plate LE5369, broke the window of a vehicle parked in the Steak 'n Shake parking lot, and stole what Officer Nunez testified appeared to be a firearm.

A few days later, on July 25, 2016, while patrolling the area near 86th Street and Michigan Road in Indianapolis, Officer Nunez observed a similar white Oldsmobile traveling southbound on Michigan Road. He was able to see the driver inside, a black male, and confirm that the vehicle's license plate matched that of the vehicle involved in the July 21 theft. Officer Nunez communicated this information to Officer Rapier as well

as over the police radio. Officers Keehn and Wroblewski heard the police radio report and responded to Officer Nunez's request for backup. The Officers then effectuated the stop after the white Oldsmobile pulled into the Marathon gas station.

Here, the information possessed by the Officers was sufficiently credible and detailed to provide reasonable suspicion to make an investigatory stop of the white Oldsmobile. With regard to the reliability of the complainant's theft report, Officer Nunez testified that the complainant was known to him and had been "helpful" to police in the past. Additionally, the cellphone video taken by the complainant which Officer Nunez reviewed corroborated the complainant's report, further buttressing its reliability. Officer Nunez observed the white Oldsmobile in a location within close proximity to the place the theft had occurred a few days earlier. The vehicle Officer Nunez saw matched not only the description of the color and model of the suspect vehicle, but also the license plate number.

These facts, particularly the highly particularized description of the automobile, the proximity of the white Oldsmobile to the location of the reported break-in and theft involving a firearm, and Officer Nunez's having observed the driver of the vehicle, a black male, were sufficient to render the driver the legitimate subject of an investigation. Accordingly, Officer Nunez had reasonable suspicion to justify an investigatory stop of the white Oldsmobile on July 25, 2016.[6] All other officers who heard Officer Nunez's

---

[6] Plaintiff argues that the facts viewed in the light most favorable to her do not support the assertion that Mr. Tyson was a suspect in the July 21 theft because he had been questioned and searched the day before and no weapons were found nor was he ticketed or arrested. However,

report, either personally or over the police radio, including Defendants Rapier, Keehn, and Wroblewski, likewise had reasonable suspicion for an investigatory stop based on the officers' "collective knowledge." *United States v. Nafzger*, 974 F.2d 906, 910 (7th Cir. 1992) ("[An] officer involved in the stop need not personally be aware of all of the 'specific and articulable' facts justifying the intrusion, however; it is sufficient that a law enforcement officer who is aware of such facts relay his or her reasonable suspicion to the officer effecting the stop, who may then rely on it."); *see also United States v. Hensley*, 469 U.S. 221, 232–33 (1985). On this basis, we hold that the Officers had reasonable suspicion to stop the white Oldsmobile in order to get a closer look at the driver and confirm or dispel the Officers' suspicions of his involvement in the July 21 theft.

The Officers claim that, based on the totality of the circumstances, they also had probable cause at this point to arrest Mr. Tyson, or, at least, that they could have reasonably believed they had probable cause in light of clearly established law and thus are entitled to summary judgment on Plaintiff's false arrest claim.[7] "[A]n officer may

---

even assuming that search occurred, there is no evidence that any of the individual defendants was involved with or otherwise aware of that search.

[7] It is not clear to us that the investigatory stop immediately ripened into a full arrest requiring probable cause as the police are entitled to order the occupants to exit the vehicle as part of a lawful investigatory stop, and, depending on whether the circumstances give rise to a justifiable fear for personal safety as well as the occupant's own actions in resisting law enforcement, the police may also use some level of force to effectuate the investigatory stop and even to remove a non-cooperating occupant from the vehicle without converting the encounter into a full arrest. *See, e.g.*, *United States v. Johnson*, 170 F.3d 708, 716 (7th Cir. 1999) ("[T]he police may order the driver out of [his] car after a lawful vehicle stop even in the absence of reasonable suspicion that the driver is armed."); *United States v. Serna-Barreto*, 842 F.2d 965, 968 (7th Cir. 1988) (holding that officers' drawing guns did not automatically escalate investigatory stop into an arrest where officers' safety required such a measure); *Smith v. Ball State Univ.*, 295 F.3d 763,

make a warrantless arrest consistent with the Fourth Amendment if there is 'probable cause to believe that a crime has been committed.'" *United States v. Daniels*, 803 F.3d 335, 354 (7th Cir. 2015) (quoting *Washington v. Haupert*, 481 F.3d 543, 547 (7th Cir. 2007)). "Police officers possess probable cause to arrest when 'the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed an offense.'" *Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007) (quoting *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)). "Probable cause does not require an actual showing of criminal activity, or even that the existence of criminal activity is more likely true than not; instead, probable cause merely requires that a probability or substantial chance of criminal activity exists." *United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018) (quotation marks and citations omitted).

As discussed above, the facts known to the officers establish that Mr. Tyson, a black male who bore a fair resemblance to the complainant's description of the weight and height of one of the two suspects in the alleged firearm theft, was found operating a vehicle in close proximity to the location of the crime whose description and license plate were an exact match to those provided by a reliable eyewitness and confirmed by video evidence. The Seventh Circuit has upheld probable cause findings on similar facts when

769 (7th Cir. 2002) (holding that the officers' "decision to [forcibly] remove Smith from his vehicle was a constitutionally permissible action pursuant to a legitimate investigatory stop under *Terry*"). However, we shall proceed no further with this analysis as Defendants have not developed this argument and we are under no obligation to construct the parties' arguments for them.

the arrest of the suspect occurred within minutes or hours of the crime. *See, e.g.*, *Maniscalco v. Simon*, 712 F.3d 1139, 1144 (7th Cir. 2013) (finding probable cause to arrest for disorderly conduct that had "just" occurred where the suspect's car, license plate, and physical appearance matched the victim's report); *United States v. Tilmon*, 19 F.3d 1221, 1228 (7th Cir. 1994) (finding probable cause to arrest where the suspect's physical appearance, albeit in different clothing, and "distinctively marked car" matched the reported suspect in a bank robbery committed two hours earlier). The facts here are to a certain extent distinguishable from these cases, given that the timing of the stop of the white Oldsmobile was more attenuated, occurring as it did four days later, rather than within a matter of minutes or hours after the suspected firearm theft. However, even if arguably this greater time span was sufficient to negate probable cause, Plaintiff has failed to overcome the Officers' qualified immunity defense. That defense entitles them to summary judgment on Plaintiff's unreasonable seizure and false arrest claims.

Qualified immunity is available to protect the Officers from liability unless it can be shown by Plaintiff that the Officers violated a clearly established right, based on closely analogous cases illustrating that the Officers' conduct was unlawful or that the violation was so obvious that reasonable officers would have known that their actions were unconstitutional. *See, e.g.*, *McGreal v. Ostrov*, 368 F.3d 657, 683 (7th Cir. 2004). No one disputes that it was clearly established by July 2016 that a warrantless arrest without probable cause is unconstitutional. However, Plaintiff has failed to point to any closely analogous cases (indeed, Plaintiff has not cited any case law at all) illustrating that the Officers should have known, based on the totality of the circumstances, that they

did not have probable cause at the time they stopped the white Oldsmobile to believe that the vehicle and its driver had been involved in the commission of a crime, to wit, the suspected firearm theft.[8]  Nor has Plaintiff provided any basis for our concluding that the purported Fourth Amendment violation was so patent that it would have been obvious to any reasonable officer.  Accordingly, the Officers are entitled to summary judgment on Plaintiff's unreasonable seizure and false arrest claims.

### B.  Excessive Force

Plaintiff next claims that Officers Nunez, Rapier, Keehn, and Wroblewski violated Mr. Tyson's Fourth Amendment right to be free from excessive force when they approached the vehicle in which he was seated behind the steering wheel with their guns drawn, broke the driver-side window after he refused to exit the vehicle, and shot him with pepper balls after he had surrendered.  (Whether he had actually surrendered at this point is a fact in dispute, though video evidence undermines any claim that Mr. Tyson had in fact surrendered.)  An excessive force claim is reviewed under a Fourth

---

[8] Plaintiff focuses her response on the contention that the police created "post-mortem probable cause" by adding Mr. Tyson as a suspect in the July 21 theft on July 26, 2016, the day after he was killed in the police action shooting and that multiple inconsistencies between the complainant's and the victim's stories in the July 21 police report belie the Officers' contention that they had reasonable suspicion and/or probable cause to justify the July 25 traffic stop. However, the reasonable suspicion and probable cause inquiries are "limited to what the officer[s] knew at the time of the arrest and not what has been gained from hindsight."  *Harney v. City of Chicago*, 702 F.3d 916, 922 (7th Cir. 2012) (citing *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1057 (7th Cir. 2011)).  The undisputed evidence here is that the only information the Officers had when they pulled over Mr. Tyson on July 25, 2016 was the information that Officer Nunez gleaned from the complainant's report and his review of the cellphone video from the July 21 theft, information which he then communicated to Officers Rapier, Keehn, and Wroblewski.  Accordingly, we rely only on these facts in determining whether the Officers had probable cause at the time of the traffic stop.  The fact that Mr. Tyson was subsequently added as a suspect following his death does not affect this analysis.

Amendment "reasonableness standard." *Padula v. Leimbach*, 656 F.3d 595, 602–03 (7th Cir. 2011). The pertinent inquiry in the context of an excessive force claim is "whether, in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an objectively reasonable manner." *Id.* at 602 (citation and quotation marks omitted).

An officer's use of force is considered unreasonable only if "judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009) (quotation marks and citation omitted). In making this determination, the court "looks to whether the force used … was excessive in relation to the danger he posed—to the community or to the arresting officers—if left unattended." *Estate of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010). Factors to consider include "the specific circumstances of the arrest, including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Cyrus v. Town of Mukwonago*, 624 F.3d 856 (7th Cir. 2010) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Plaintiff again has failed to put forth any developed argument to support the conclusion that under clearly established law, reasonable officers should have known that in immediately drawing their weapons and later breaking the car window in an effort to effect Mr. Tyson's seizure after he refused to comply with the Officers' lawful order to exit the vehicle constituted unconstitutional uses of force. Not only has Plaintiff failed to

cite any factually analogous cases establishing that such uses of force are unlawful, the case law actually supports the opposite conclusion.

It is well-settled under Seventh Circuit law that "[w]here the suspect is thought to be armed, or even when he is thought to be involved in criminal activity in which the use of weapons is a commonplace, police may protect themselves by displaying their weapons." *United States v. Lechuga*, 925 F.2d 1035, 1040 (7th Cir. 1991). Based on the facts described above, it was reasonable for the Officers to believe that an occupant in the white Oldsmobile might have a firearm. Although the stop occurred in daylight, the vehicle had darkly tinted windows which Mr. Tyson refused to open more than a crack and which made it difficult for the Officers to see inside the car. Moreover, the stop was made at a gas station being frequented by members of the public. The circumstances of the original theft as known to the Officers included the use or possession or theft of a firearm. One officer observed Mr. Tyson to drop his hands into his lap at one point in a suspicious, furtive manner. In these circumstances, it was not an unreasonable display of force for the Officers to have drawn their guns to protect themselves as well as the customers who were at the gas station at the time of the stop, given their belief that Mr. Tyson could be armed.

Given Mr. Tyson's failure to comply with the Officers' lawful orders to exit the vehicle, Officer Wroblewski's and Officer Keehn's actions in breaking the driver-side window were also not in contravention of clearly established constitutional principles. If there is "a reasonable and objective basis that will justify an investigative detention [or arrest], the officer may use reasonable force to effect the detention." *United States v.*

*Denney*, 771 F.2d 318, 321 (7th Cir. 1985). Such a reasonable and objective basis existed here. Plaintiff contends that Mr. Tyson had surrendered at that point, was not actively resisting arrest, and thus, there was no need to take steps to remove him from the vehicle. However, what actually occurred was captured on cellphone video and that evidence of the encounter does not support this characterization of Mr. Tyson's conduct. In addition to refusing to exit the vehicle, Mr. Tyson can be heard screaming and cursing at the Officers, repeatedly ordering them away from his car, and, at one point, yelling, "Bitch! Put your gun up!" Dkt. 43-11 at 00:26–00:28.

Under these circumstances, Mr. Tyson's "unresponsiveness did not neutralize the safety threat, but rather exacerbated it by adding an element of unpredictability." *Smith v. Ball State Univ.*, 295 F.3d 763, 769 (7th Cir. 2002) (holding that the forcible removal of the occupant from a vehicle during an investigatory stop was reasonable). This is particularly true given that the darkly tinted windows made it difficult to see inside the vehicle. The Officers did not know whether Mr. Tyson was armed but had reason to believe he was recently involved in a theft involving a firearm. Officer Keehn's and Officer Wroblewski's actions in breaking the window were therefore not obviously unreasonable in that they were taken both to effect the detention of Mr. Tyson as well as to ensure officer safety, given his noncompliance with their orders to exit the vehicle. *See Burdette v. Foote*, No. 1:19-CV-532-WCL-SLC, 2020 WL 419394, at *2 (N.D. Ind. Jan. 24, 2020) (holding that it was reasonable for officers to break window of vehicle to effect arrest after the occupant refused orders to exit the vehicle). Accordingly, the

Officers are entitled to summary judgment on Plaintiff's excessive force claim for having drawn their guns and broken the driver-side window during the stop of the vehicle.

Whether Officer Wroblewski's use of the pepper ball gun after Mr. Tyson failed to comply with orders to exit the vehicle was a reasonable use of force is a closer question. Defendants claim that Officer Wroblewski's actions were reasonable because at the time that he shot the first three pepper balls into the vehicle, he had probable cause to believe that Mr. Tyson was resisting law enforcement as well as reason to believe that he could be armed, and quick action was necessary given Mr. Tyson's erratic behavior which was escalating the unpredictability and thus the potential danger of the situation.[9] Even if such a use of force were unreasonable, Defendants argue that Officer Wroblewski is entitled to qualified immunity because it was not clearly established by July 2016 that use of a pepper ball gun to gain compliance from an uncooperative individual was violative of the Fourth Amendment.

Plaintiff rejoins that, under the totality of the circumstances, the force used by Officer Wroblewski was plainly excessive, pointing to the following facts: at the time Officer Wroblewski shot the initial three pepper balls at Mr. Tyson, no more than a few minutes had passed since Mr. Tyson had first been given the order to exit the vehicle, Mr.

---

[9] Officer Wroblewski avers that he also had probable cause to believe the Mr. Tyson "had fired shots in an incident that involved the robbery of a gun days earlier" and therefore "had probable cause to believe [Mr. Tyson] committed a felony involving the threat of serious bodily injury." Wroblewski Aff. ¶ 23. However, at the time he used the pepper ball gun, Officer Wroblewski knew only what Officer Nunez had shared about the July 21 theft over the police radio, which was that the white Oldsmobile was suspected of having been involved in the theft of a firearm from a vehicle. Officer Nunez did not report that a robbery had occurred or that shots had been fired during the incident as he was unaware of that information until after July 25.

Tyson had surrendered at that point, so there was no immediate threat to the officers, the use of the pepper ball gun—which is normally used for purposes of crowd control and dangerous animals—contravened the IMPD's policies regarding the use of "control devices" and the proper response to "barricaded subjects," and Officer Wroblewski was aware that his supervisor was en route to the scene but failed to wait for his arrival or consult him before deploying the weapon.

While we agree that the interval between when Mr. Tyson was first ordered out of the vehicle and Officer Wroblewski deployed the pepper ball gun in an attempt to secure Mr. Tyson's compliance with the Officers' orders was quite brief, to wit, no more than four minutes, that fact alone is not determinative of the reasonableness of the action under the circumstances. By the time Officer Wroblewski deployed the pepper ball gun, the Officers had repeatedly ordered Mr. Tyson to exit the car and Mr. Tyson continued no to comply. After Officer Keehn broke the driver-side window in an attempt to remove Mr. Tyson from the vehicle, Officer Wroblewski observed Mr. Tyson actively resisting Officer Keehn's attempts to effect his seizure. As summarized above, the cellphone video footage also contradicts Plaintiff's claim that Mr. Tyson had by that point surrendered, showing him screaming and cursing at the Officers and yelling for one of the officers to raise a weapon. Under these circumstances and given the rapidly escalating tensions, a reasonable officer in Officer Wroblewski's position could have reasonably believed under then-clearly established law that the deployment of non-lethal pepper balls to gain the compliance of an individual there was probable cause to believe was involved in a firearm theft and could potentially be armed, who was ignoring lawful

orders and actively resisting law enforcement's efforts to seize him, was a reasonable use of force. *Cf. Smith v. Vill. of Hazel Crest*, No. 11 C 2945, 2013 WL 182814, at *4 (N.D. Ill. Jan. 17, 2013) (finding that the use of a pepper ball launcher to secure compliance from an individual who had barricaded himself in his bedroom, failed to comply with the officers' orders, and was known to be violent and suicidal was a reasonable use of force).

As the Seventh Circuit has recognized, "It is easy in retrospect to say that officers should have waited, or should have used some other maneuver … but the fourth amendment does not require second guessing if a reasonable officer making decisions under uncertainty and the press of time would have perceived a need to act." *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003); *see also Graham*, 490 U.S. at 397 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). Here, given the escalating tensions as corroborated by the cellphone video, a reasonable officer in Officer Wroblewski's position could have believed in that moment that the risks of intervention with non-lethal force were less than the risks of doing nothing. Under the circumstances, a reasonable officer could have also reasonably concluded, as Officer Wroblewski did, that lesser uses of force, including physically removing Mr. Tyson from the car or the use of pepper spray, would be both less effective at securing compliance and more dangerous for the Officers, given that Mr. Tyson had demonstrated his willingness to interfere with law enforcement's efforts when Officer Keehn was within his reach. It was therefore reasonable for Officer Wroblewski to

believe that the pepper ball gun, which would allow the Officers to stand at a safe distance but still incapacitate Mr. Tyson with effects similar to pepper spray, would provide the Officers the best opportunity to either force Mr. Tyson's surrender or apprehend him with a minimal risk of harm.[10]

No reasonable jury could find that Officer Wroblewski's continued use of the pepper ball gun once Mr. Tyson began driving away from the gas station constituted excessive force. At that point, Mr. Tyson was not only fleeing the scene, but was also operating his vehicle in a manner that endangered pedestrians and other drivers. As the Seventh Circuit has recognized, "an automobile may be used as a deadly weapon." *Scott v. Edinburg*, 346 F.3d 752, 757 (7th Cir. 2003). Under such circumstances, it was undoubtedly reasonable for Officer Wroblewski to use non-lethal force in an attempt to incapacitate Mr. Tyson.

In sum, Plaintiff has not carried her burden to identify a "closely analogous case that established a right to be free from the type of force the police officers used on [Mr. Tyson] or [shown] that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (citation and quotation marks omitted). In her efforts to overcome Officer Wroblewski's qualified immunity defense, she focuses exclusively on the fact that his actions in deploying the pepper ball gun contravened the IMPD's polices on the use of "control devices" and

---

[10] We of course recognize that, while the debilitating effects are similar, the pepper ball gun, being an impact weapon, clearly involves a greater use of force than pepper spray.

"barricaded subjects." However, the Seventh Circuit "has consistently held that '42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of … departmental regulations and police practices." *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) (quoting *Scott*, 346 F.3d at 760). While the IMPD's policies are not completely irrelevant to our analysis, they are not determinative of the Fourth Amendment reasonableness inquiry here. Seventh Circuit law is clear that qualified immunity "protects all but the plainly incompetent and those who knowingly violate the law." *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008) (citation and quotation marks omitted). Neither of these things can be said about Officer Wroblewski's deployment of the pepper ball gun under the circumstances he faced on July 25, 2016, and he is therefore entitled to qualified immunity.

For these reasons, Plaintiff's excessive force claim against the Officers cannot survive summary judgment.

## III. State Law Claims and the Indiana Tort Claims Act

Plaintiff's amended complaint asserts Indiana state law claims for unreasonable seizure, excessive force/battery, and wrongful death against the individual officers and the City. Specifically, Plaintiff alleges that Mr. Tyson's death was "a natural, probable, and foreseeable result of the battery, unreasonable seizure, and/or excessive force" by the Officers, acting as agents for the City and other IMPD officers.

Because "Indiana's excessive force standard effectively parallels the federal standard," *Fidler v. City of Indianapolis*, 428 F. Supp. 2d 857, 866 (S.D. Ind. 2006), given our conclusion that the Officers acted reasonably under the Fourth Amendment and

did not use excessive force against Mr. Tyson, Defendants are entitled to summary judgment on Plaintiff's battery claim. *See Estate of Williams v. Ind. State Police*, 26 F. Supp. 3d 824, 864 (S.D. Ind. 2014) ("Plaintiffs rightly recognize that their battery claim rises or falls with their § 1983 excessive force claims: the issue is whether the officers used unreasonable force. If so, they are liable for battery. If not, they are not liable.") (quotation marks omitted). Likewise, because we have found, for the reasons detailed above, that the Officers did not falsely arrest Mr. Tyson, Plaintiff's state law unreasonable seizure claim fails.

Plaintiff's wrongful death claim is based on the theory that Mr. Tyson's death was the foreseeable result of the Officers' unreasonable seizure, use of excessive force, and battery. Indiana's wrongful death statute permits the recovery of damages for an individual's death '[w]hen the death … is caused by the wrongful act or omission of another." *Id.* at 863 (quoting Ind. Code § 34-23-1-1). The evidence in this case does not support Plaintiff's theory of liability. As we have held, the Officers acted reasonably under the Fourth Amendment in seizing Mr. Tyson and did not use excessive force against him. Following the Officers' lawful interactions with Mr. Tyson, he took deliberate action in fleeing the gas station, leading IMPD officers on a high-speed chase throughout the City, all while shooting at several of the officers, injuring one and disabling the vehicle of another.[11] The undisputed evidence is that it was this conduct

---

[11] Plaintiff claims that there is a genuine issue of material fact regarding whether Mr. Tyson was in possession of a firearm that day, based on her own testimony and the testimony of Mrs. Tyson that they had never known him to own a gun as well as the Officers' testimony that they did not see Mr. Tyson with a firearm during the Officers' interaction with him at the gas station, and the

that led to the constitutionally reasonable[12] use of deadly force against Mr. Tyson, not any unlawful seizure or excessive use of force by the Officers. Accordingly, Defendants are entitled to summary judgment on Plaintiff's wrongful death claim.

## IV. Conclusion

For these reasons, Plaintiff's Motion for Leave to File Surreply [Dkt. 67] is

<u>GRANTED</u>, Defendants' Motion for Summary Judgment [Dkt. 41] is <u>GRANTED</u>, and

Defendants' Motion to Exclude Expert Testimony [Dkt. 55] is <u>DENIED AS MOOT</u>.

Final judgment shall issue accordingly.

IT IS SO ORDERED.

Date: _____3/31/2020_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

fact that no firearm was included on the police report following the police action shooting. However, Mrs. Tyson conceded that Mr. Tyson would not have told her if he had a firearm and there is ample evidence in the record establishing that he not only possessed, but used, a firearm on July 25, 2016, including the multiple minutes of police radio traffic where officers reported being shot at and hit by Mr. Tyson during the high-speed chase, documented evidence of bullet holes in various police cars, and Officer Nunez's gunshot wounds. Given this overwhelming evidence, we find that no reasonable fact finder could conclude that Mr. Tyson did not possess a gun on July 25, 2016.

[12] Plaintiff has not sued any of the individual officers who used deadly force against Mr. Tyson.

Distribution:

Faith Elizabeth Alvarez
LEE COSSEL & CROWLEY LLP
falvarez@nleelaw.com

Traci Marie Cosby
OFFICE OF CORPORATION COUNSEL
Traci.Cosby@indy.gov

Nathaniel Lee
LEE COSSEL & CROWLEY LLP
nlee@nleelaw.com

John Michael Lowery
LEE BURNS COSSELL & KUEHN
jlowery@nleelaw.com

Andrew J. Upchurch
OFFICE OF CORPORATION COUNSEL
andrew.upchurch@indy.gov